IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JAIMEE SHAPIRO, | |
| Plaintiff, | Civil Action No. _____ |
| v. | |
| CBR SYSTEMS, INC., | Jury Trial Demanded |
| Defendant. | |

## **COMPLAINT**

Plaintiff Jaimee Shapiro ("Plaintiff" or "Ms. Shapiro") states her complaint against Defendant CBR Systems, Inc. ("Defendant" or "CBR") as follows:

## **INTRODUCTION**

### 1.

This is a civil rights action for money damages and equitable and declaratory relief brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII").

## **JURISDICTION AND VENUE**

### 2.

This Court has subject matter jurisdiction over Plaintiff's claims pursuant to

28 U.S.C. § 1331 and § 1343, as well as 42 U.S.C. § 2000e-5.

3.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the violations of Plaintiff's civil rights alleged herein were committed in this judicial district.

**PARTIES**

4.

Ms. Shapiro is, and at all times relevant to suit has been, a resident and a citizen of the State of Georgia.  She was employed by Defendant CBR from approximately September 1, 2006 until her wrongful and discriminatory termination on October 12, 2011.

5.

Ms. Shapiro is an "employee" within the meaning of 42 U.S.C. § 2000e(f).

6.

Defendant CBR is a Delaware corporation that is based in San Bruno, California, and conducts business throughout the United States, including within the State of Georgia.  CBR is subject to the jurisdiction of this Court and can be served with a copy of the summons and Complaint through its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington,

Delaware 19808.

7.

CBR is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

## FACTUAL ALLEGATIONS

### *CBR and the Banking of Cord-Blood Stem Cells*

8.

"Cord blood" is blood that remains in the umbilical cord and/or placenta after a child is born.

9.

Cord blood contains many "stem cells," which are specialized cells that are indefinitely self-renewing and produce cell progeny that mature into differentiated, organ-specific cells. Stem cells are the only cells in the human body that can generate new cell types. For these reasons, stem cells can be used to treat a number of serious diseases and medical conditions which are characterized by damaged or diseased blood-forming cells, including several common forms of cancer as well as certain blood, immune, and metabolic disorders.

10.

When stem cells are used in medical treatments, the likelihood of success is typically increased when the stem cells being used were harvested from the

individual receiving them (or a member of that individual's immediate family) as part of the treatment.  Thus, a market has developed to allow families to freeze and store cord blood for future use.

11.

CBR markets itself as the world leader in cord blood stem cell banking, claiming to be the world's largest and most experienced stem-cell bank and purporting to store cord blood and tissue for more than 400,000 children.

### Ms. Shapiro's Employment at CBR

12.

In September 2006, CBR hired Ms. Shapiro to work as a Regional Manager ("RM"), a sales position, for the "Atlanta 1" territory in what CBR designated as the Mid-Atlantic Region, which included the State of Georgia.

13.

As a Regional Manager, Ms. Shapiro's duties involved, among other things, business development, representation of CBR's products and services, and account development.  Her day-to-day activities consisted primarily of educating doctors and medical practices about cord-blood banking and CBR's services, so that those doctors and hospitals would then encourage their patients to enroll in CBR's services.

14.

When she was hired, Ms. Shapiro was one of approximately 39 RMs employed by CBR throughout the United States.  There was one other RM in the Atlanta area: Lauren Stockton, who was assigned the "Atlanta 2" territory.

15.

When Ms. Shapiro was hired in 2006, her immediate supervisor was a woman named Joan Shutte.  Effective June 1, 2007, following some internal reorganizations at CBR, Ms. Shapiro's supervisor became Mark Swanson, who was a Regional Sales Director for CBR responsible for the Mid-Atlantic Region.

16.

In his capacity as Regional Sales Director, Mr. Swanson supervised approximately 9 Sales Managers, including Ms. Shapiro and Ms. Stockton.

17.

In or around May of 2010, Mr. Swanson became a National Sales Director for CBR.  He is no longer employed by CBR, although upon information and belief, his termination was in no way related to Ms. Shapiro or the allegations of this Complaint.

18.

Ms. Shapiro also reported to Cornelius Merlini, Senior Vice President of

Commercial Operations.  In or around May of 2010, Mr. Merlini was released of his duties as Vice President of Commercial Operations but continued to work at CBR as a consultant through approximately the end of 2010.

19.

Upon information and belief, Mr. Merlini is no longer employed by CBR. Upon information and belief, the termination of Mr. Merlini's employment was also unrelated to Ms. Shapiro and the facts of this Complaint.

***Ms. Shapiro's Job Performance: 2006-2009***

20.

During Ms. Shapiro's tenure at CBR, two of the metrics by which her job performance was measured were Sales Goal Attainment (i.e., the volume of sales she brought in compared with a quota or goal set by CBR management) and Territory Growth (i.e., expanding the volume of sales within her assigned territory).

21.

2007 was Ms. Shapiro's first full year working for CBR.  In the first quarter of 2007, Ms. Shapiro ranked first of 8 RMs in the Mid-Atlantic Region and eighth of 56 RMs nationally in terms of Sales Goal Attainment, exceeding her sales quota by more than 12%.  She also ended the year on a strong note, achieving almost

93% of her sales goal during the fourth quarter, which ranked her second (of 9 RMs) in the Mid-Atlantic Region and 18th (of 38 RMs) nationally.

22.

Although Ms. Shapiro's performance fluctuated during the second and third quarters of 2007 as she adapted to the learning curve of her new job, she was never made aware of any performance issues, nor was she put on any type of plan intended to improve or manage her job performance.

23.

In fact, in December of 2007 she won an internal sales contest and received recognition and appreciation for what Mr. Merlini described as her "focused effort."

24.

Despite having won that contest, Mr. Swanson's annual performance appraisal of Ms. Shapiro stated that she did not win any contests in 2007, and he provided a list of all (or substantially all) of the contests at CBR that year except the one Ms. Shapiro did in fact win.

25.

For the year 2008, Ms. Shapiro ranked second (of 9 RMs) in her region and eighth (of 39 RMs) nationally in terms of Territory Growth.

26.

Again, she was never made aware of any performance problems or put on any performance management plan during 2008.

27.

In early 2009, Mr. Swanson sent Ms. Shapiro an e-mail in which he noted that she had done "a tremendous job" of growing one of her customers by "a whopping 72%" in 2008 over 2007.

### Ms. Shapiro's Pregnancy and CBR's Discrimination: 2009-2011

28.

2009 was a standout year for Ms. Shapiro.  She ranked first (of 9 RMs) in the region and seventh (of 39 RMs) nationally for her Sales Goal Attainment.

29.

Ms. Shapiro achieved these sales despite the fact that her sales quota for the second quarter of 2009 was set above the number of sales that had been made in her territory for any of the preceding four quarters.  (In the second quarter of 2008, Ms. Shapiro made 155 sales, which was the highest of the four quarters preceding the second quarter of 2009, when Mr. Swanson set her sales goal at 160.)

30.

She received a "Region Sales Award" from CBR recognizing her for highest

sales goal achievement in 2009.

31.

In 2009, Ms. Shapiro also ranked number one in the region for Territory Growth.  Her 2009 sales were more than 10% higher than her 2008 sales, and 76% higher than her 2007 sales.  CBR recognized Ms. Shapiro by giving her a "Region Sales Award" from CBR recognizing her for highest territory growth in 2009.

32.

In addition to the quantifiable aspects of her job, Ms. Shapiro dedicated much time and energy to aspects of her position which, though not easily quantifiable, are critical to both sales goal attainment and territory growth.

33.

For example, on February 3, 2009, Ms. Shapiro coordinated a dinner with several of her key customers, and Mr. Swanson sent her an e-mail after the event recognizing her for the hard work she had put into that event as well as into her job performance generally.  She also took advantage of other opportunities to socialize with her actual and potential customers in order to get to know them on a personal level and learn about their experiences with cord-blood banking and CBR.

34.

In or around March of 2009, Ms. Shapiro and her husband decided they were

ready to grow their family, so they started trying to get pregnant.

35.

Around that same time, Ms. Shapiro told Ms. Stockton (whom she regarded as a personal friend) of the plan to grow her family.

36.

In May of 2009, Ms. Shapiro learned that she was newly pregnant.

37.

Because Ms. Shapiro's employment with CBR required her to be continuously visiting or in contact with OB/GYN offices and the medical staff who worked at those offices, she felt she had to disclose her pregnancy to CBR earlier than she otherwise would have (i.e., before the completion of her first trimester), to ensure that CBR learned of her pregnancy directly from her rather than through a third party.

38.

Ms. Shapiro told Ms. Stockton that she was pregnant on the day Ms. Shapiro found out, in May of 2009. (In the summer of 2008, Ms. Stockton had assumed duties as Region Field Trainer in addition to her Regional Manager role.) She then told Mr. Swanson of her pregnancy during his visit to Atlanta in June of 2009, although she suspected that he had already learned about it through Ms. Stockton.

39.

Almost immediately after Ms. Shapiro disclosed to CBR that she intended to have a baby, and then after she informed CBR that she was pregnant, the company began to micromanage her, criticize her performance, deprive her of opportunities, and otherwise discriminate against her.

40.

For example, on July 28, 2009, Mr. Swanson sent Ms. Shapiro an e-mail message discussing an upcoming dinner with the doctor in charge of a practice that was critical to Ms. Shapiro's business.  Mr. Swanson indicated that he and Mr. Merlini would attend the dinner and meet with this doctor and that Ms. Shapiro would not be invited to join them, even though this was one of her most significant customers and she had made the arrangements for the dinner.

41.

In October of 2009, Mr. Swanson threatened to place Ms. Shapiro on a performance improvement plan.  Ms. Shapiro complained to CBR's Director of Human Resources, Patrick Tracey, that Mr. Swanson was using selective data to justify his criticisms of her performance and that she was otherwise being treated unfairly due to her pregnancy.  Mr. Tracey did not respond, but Ms. Shapiro was not placed on a performance improvement plan at that time.

42.

Ms. Shapiro gave birth to her son on February 1, 2010.

43.

On March 22, 2010, following her maternity leave, Ms. Shapiro returned to work at CBR.  Upon her return, she was still reporting to Mr. Swanson and Mr. Merlini, but CBR's internal reorganizations continued.  In or around May of 2010, Mr. Merlini was removed from his Vice President position, and Ms. Shapiro reported to Mr. Swanson and a woman named Maggie Powers, both of whom had been designated National Sales Directors.  A few months later, in or around July of 2010, Ms. Powers was promoted to Vice President of Field Operations, while Mr. Swanson remained National Sales Director, and Ms. Shapiro continued to report to both of them.

44.

Following Ms. Shapiro's return to work, her professional relationship with Mr. Swanson continued to decline.

45.

Because she was on maternity leave during the first quarter of 2010, Ms. Shapiro arranged ahead of time for her territory to be covered, in part, by Ms. Stockton and Mr. Swanson.

46.

Understandably, her territory underperformed during the first quarter of 2010 (while she was out on maternity leave) and during the second quarter (as she was getting back up to speed following her 3-month leave). Upon information and belief, CBR has a policy that provides a one-quarter grace period to employees returning from a leave of absence, recognizing that there will be a transition period before the employee's performance will return to pre-leave levels. Nevertheless, the performance of Ms. Shapiro's territory during the first two quarters of 2010 were held against her, even though CBR purported to acknowledge that those results were not attributable to any action or inaction by Ms. Shapiro.

47.

Indeed, Ms. Shapiro's performance was strong during the third quarter of 2010, when she finished number one in her region and eighth in the nation. Similarly, she finished the fourth quarter of 2010 ranked fourth in the region and ninth in the nation.

48.

Despite her solid performance, the negative treatment continued.

49.

Mr. Swanson accompanied Ms. Shapiro on a field ride in the fall of 2010,

just ten days after Ms. Shapiro had a procedure to address a heart condition which was discovered during her pregnancy. Notwithstanding doctor's orders that she not lift more than ten pounds, Mr. Swanson insisted that she personally carry heavy marketing and promotional materials and refused to help her. As a result of Mr. Swanson's refusal to provide even the most basic accommodation to Ms. Shapiro, she suffered substantial bruising from the surgical entry site all the way down her leg. Some of the doctors visited by Mr. Swanson and Ms. Shapiro that day noticed the bruising and commented that Ms. Shapiro should not be doing as much as she was for health reasons.

50.

Mr. Swanson also continued to undermine Ms. Shapiro's sales efforts. In November of 2010, a healthcare provider in Ms. Shapiro's territory finally agreed to revise their education system after Ms. Shapiro spent more than a month working to get that result. Mr. Swanson immediately questioned the head of the practice group leader about whether that was the best decision and otherwise undermining Ms. Shapiro's repeated efforts to achieve this outcome.

51.

By January of 2011, the situation had so deteriorated between Ms. Shapiro and Mr. Swanson that Ms. Shapiro had no option but to defend herself and point

out the unfair treatment she had been receiving.

52.

By way of example, Ms. Shapiro pointed out that Mr. Swanson frequently tried to take credit for improvements in Ms. Shapiro's performance by claiming that such improvements followed conversations in which he counseled her. However, in reality, the improvements in her performance were due to her own efforts, not those of Mr. Swanson.

53.

Ms. Shapiro also called attention to the fact that Mr. Swanson was negative towards Ms. Shapiro's ideas, criticized her both privately and in front of Ms. Shapiro's colleagues, and failed to give her credit for pioneering practices which eventually were accepted on a widespread basis by the company.

54.

Mr. Swanson criticized Ms. Shapiro for putting what he considered too narrow a focus on certain hospitals and practices within her territory, even though, when Mr. Swanson visited Ms. Shapiro's territory, those were the same providers with whom he met and on whom he himself focused, because they were the largest practices and offered the most potential business to CBR.

55.

Ms. Shapiro was consistently undermined by Mr. Swanson in front of not only her peers, but some of her most important customers, and he would try to take credit for Ms. Shapiro's successes in her region but would promptly blame Ms. Shapiro for any challenges or failures.

56.

Ms. Shapiro told Mr. Swanson in January of 2011 that she felt threatened and bullied by him, and that while she believed many of her teammates shared that opinion, she felt that she personally received excessive unfair treatment from him, something which she had previously complained about to human resources.

57.

Mr. Swanson also gave recognition and praise to other members of the Mid-Atlantic team while refusing to give such praise to Ms. Shapiro, leading to a situation where Ms. Shapiro was portrayed to her peers as being unsuccessful when, in fact, she was experiencing the same or better successes they were.

58.

Mr. Swanson further hurt Ms. Shapiro's job performance by not timely giving her performance feedback so that she could correct any problems promptly. On the other hand, other Regional Managers, including Ms. Stockton,  were  given

feedback in a much more prompt manner, ensuring that they had the opportunity and time to correct any problems quickly before further performance evaluations from other members of CBR's management.

59.

After bringing these matters to Mr. Swanson's attention in January of 2011, Ms. Shapiro brought these and similar problems to the attentions of CBR's Director of Human Resources, Mr. Patrick Tracey.  Human Resources did nothing to address her complaints, and the discriminatory and unfair treatment continued.

60.

In February of 2011, despite the fact that Ms. Shapiro had finished in the top ten of RMs nationally for three of the four previous quarters during which she had been active in her territory, and despite the fact that she had ranked first in the region for two of those quarters, Mr. Swanson placed Ms. Shapiro on a performance improvement plan in February of 2011.

61.

Ms. Shapiro successfully completed all that was required of her under the performance improvement plan in April of 2011.

62.

The very next month, while at a sales meeting in Arizona, Mr. Swanson used

sexually suggestive body language to reference how he and Ms. Shapiro could "bury the hatchet" and have a better relationship moving forward.

63.

Ms. Shapiro refused Mr. Swanson's advances.

### Ms. Shapiro is Terminated

64.

CBR never responded to Ms. Shapiro's numerous complaints with any formal action, telling her only that they had a "heightened awareness" of the issue and asking her to trust that it would be addressed.

65.

The problems were never addressed, and on October 12, 2011, Ms. Shapiro's employment was involuntarily terminated by CBR.

66.

Ms. Shapiro requested, as many terminated employees do, that the official paperwork accompanying her termination reflect that she resigned.  She then submitted a brief resignation letter stating only that she was submitting her two-weeks' notice of her intent to resign.

## ADMINISTRATIVE PROCEDURES

### 67.

Ms. Shapiro filed a Charge of Discrimination with the Atlanta District Office of the U.S. Equal Employment Opportunity Commission ("EEOC") on April 4, 2012 (Charge No. 410-2012-3382).

### 68.

On September 28, 2012, the EEOC issued a Notice of Suit Rights to Ms. Shapiro, which was received on October 4, 2012.

### 69.

All conditions precedent to the filing of this complaint have been satisfied.

## SUBSTANTIVE CLAIMS

### Count One – Sexual Harassment in Violation of Title VII

### 70.

The preceding paragraphs are incorporated herein by reference.

### 71.

Ms. Shapiro is female.

### 72.

As detailed above, Ms. Shapiro was subjected to sexual harassment, sexual advances, and other unwelcome conduct by Mr. Swanson when he was her

immediate supervisor.

73.

The harassment she endured was based on her sex.

74.

The harassment was sufficiently severe and pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment.

75.

The sexual harassment described in the preceding paragraphs culminated with Ms. Shapiro's termination in October of 2011.

76.

CBR was aware of the harassment being committed by Mr. Swanson, in part because Ms. Shapiro reported such harassment.  Yet CBR took no steps to remedy the ongoing discrimination.

77.

CBR's discriminatory acts were done intentionally and with malice or reckless indifference to Ms. Shapiro's rights under Title VII.

78.

CBR's actions have caused Ms. Shapiro to suffer both monetary and non-

monetary damages, as well as emotional pain and suffering.

**Count Two – Pregnancy Discrimination in Violation of Title VII**

79.

The preceding paragraphs are incorporated herein by reference.

80.

Title VII prohibits employers from taking adverse employment actions against women due to pregnancy.

81.

CBR's acts alleged above, including the termination of Ms. Shapiro's employment in October of 2011, constitute adverse employment actions taken in response to Ms. Shapiro's pregnancy.

82.

CBR's discriminatory acts were done intentionally and with malice or reckless indifference to Ms. Shapiro's rights under Title VII.

83.

CBR's actions have caused Ms. Shapiro to suffer both monetary and non-monetary damages, as well as emotional pain and suffering.

## **REQUEST FOR RELIEF**

Plaintiff respectfully requests this Court:

1.     Issue a declaratory judgment that Defendant's acts, policies, practices, and procedures complained of herein violated Plaintiff's rights as secured by Title VII;

2.     Order Defendant to make Plaintiff whole by providing for her back pay, front pay, and other benefits and expenses in an amount to be proven at trial;

3.     Grant to Plaintiff compensatory damages in an amount reasonable and commensurate with the losses imposed upon her by Defendant's unlawful and discriminatory acts, including her pain and emotional distress;

4.     Grant to Plaintiff her costs in this action and a reasonable attorneys' fee as provided by law; and

5.     Grant such additional relief as this Court deems proper and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for all issues so triable.

[Signature Follows]

Respectfully submitted this 28th day of December, 2012.


      *s/ Jennifer K. Coalson*
Andrew Y. Coffman
Georgia Bar No. 173115
Jennifer K. Coalson
Georgia Bar No. 266989

**PARKS, CHESIN & WALBERT, P.C.**
75 Fourteenth Street
26th Floor
Atlanta, GA 30309
(404) 873-8000 Telephone
(404) 873-8050 Facsimile
acoffman@pcwlawfirm.com
jcoalson@pcwlawfirm.com

*Counsel for Plaintiff*